1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                       EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| JESSE GONZALES, | ) 1:10-cv-00657-SKO |
| | ) |
| | ) **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | ) **SOCIAL SECURITY COMPLAINT** |
| | ) |
| v. | ) (Doc. 1) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
|_____| ) |

18

19                              **I.  BACKGROUND**

20         Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the

21  "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB")

22  and supplemental security income ("SSI") pursuant to Title II and XVI of the Social Security Act

23  (the "Act").  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is currently before the Court on the

24  parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto,

25  United States Magistrate Judge.[1]

26  _____

27         [1]  The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 8, 9.)  On April 15,
    2011, the action was assigned to the Honorable Sheila K. Oberto for all purposes.  *See* 28 U.S.C. § 636(c); Fed. R. Civ.
28  P. 73; *see also* L.R. 301, 305.

## II.  FACTUAL BACKGROUND

Plaintiff was born December 26, 1945, previously worked in maintenance and landscaping for a residential property manager, and has worked in property management.  (Administrative Record ("AR") 1125, 1128-31.)  Plaintiff has completed the equivalent of two years of college and earned a certificate for completing a real estate course in 2003.  (AR 1125-26.)  He was on active duty in the United States Army from 1966 to 1972, but never participated in combat.  (AR 267, 475, 578, 774, 1133.)  He was honorably discharged from service on May 17, 1972.  (AR 267, 1133.)

Plaintiff filed the current application for DIB and SSI on September 23, 2005.  (AR 25, 79.) Plaintiff alleges disability beginning January 1, 2003, because of post traumatic stress disorder ("PTSD"), anxiety, and depression.  (AR 25, 95.)  Plaintiff last worked on September 21, 2005.  (AR 96, 1126.)

### A.    Medical Evidence

Plaintiff has received extensive treatment with the Department of Veterans Affairs ("VA"). (AR 150-618, 628-794.)  The visits, treatments, and opinions of VA physicians and others relevant to his current application are outlined below.

On October 8, 2003, Plaintiff was seen at the VA Medical Center ("VAMC") in Los Angeles, California, as an outpatient for a Biopsychosocial Assessment and Initial Plan.  (AR 168-74.)  His chief complaints were "anger, frustration, and stress."  (AR 168.)  He "expressed persistent homicidal ideation toward his former supervisor . . . [and] indicated that in the past he had devised plans to exact revenge on his supervisor, but has refrained from acting out these plans for fear of going to jail and abandoning his 23 year-old son who lives with him."  (AR 169.)  "The focus of this treatment was primarily coping with stress."  (AR 169.)  His GAF score was 68.  (AR 173.)

On November 25, 2003, Plaintiff was seen at the VAMC in Los Angeles, California, to determine if he could benefit from psychotropic medication.  (AR 166-67.)  Ultimately, psychotropic medications were not prescribed, but the staff psychiatrist noted that Plaintiff expressed passive homicidal ideation toward a previous employer who had recently terminated him.  (AR 166.)

On March 4, 2004, Plaintiff returned to the VAMC in Los Angeles, California, for depressive symptoms, claiming he was experiencing stress and not sleeping.  (AR 163.)  He was referred to the

mental health clinic there for depression and stress and instructed to do relaxing activities. (AR 164.)  On March 15, 2004, Plaintiff saw a social worker and requested housing assistance. (AR 159.)  He claimed to be living with family members and was informed of various options for veteran housing in the area. (AR 159.)

On July 13, 2005, Plaintiff met with a VA social worker, Ms. Jami Jensen, in Fresno, California, to discuss housing. (AR 582-83.)  Ms. Jensen noted that computer records indicated Plaintiff had a history of homelessness, economic trouble, and PTSD, and she observed that Plaintiff exhibited signs of anxiety and depression. (AR 582.)  Ms. Jensen assisted Plaintiff with temporary employment referrals, low cost housing referrals, and information on VA homeless programs. (AR 582-83).

On September 21, 2005, Plaintiff completed an intake form at the Fresno VAMC. (AR 575-81.)  He exhibited symptoms of depression and anxiety, he claimed to dream about hurting people, and he was sad when he thought about his life. (AR 576.)  The staff psychiatrist escorted him to the main VAMC hospital due to his apparent danger to others, where he was admitted for psychiatric treatment. (AR 573-74.)

Plaintiff's admission records indicate that he was held for his "complaints of severe anger toward former coworkers and homicidal ideation," and identified symptoms of homicidal/suicidal ideation, PTSD, and ineffective coping skills. (AR 552, 575-81, 613.)  His GAF scale score at admission was 40. (AR 572, 556.)  Prior to discharge, he was re-evaluated and assigned a GAF scale score of 45. (AR 574.)

Plaintiff was discharged on September 22, 2005, based on his improved condition. (AR 438.)  The discharging psychiatrist noted that "[h]e is mildly hard of hearing, which makes communication difficult[, but his s]peech is [a] normal rate and rhythm, slightly increased in volume but normal in tone. (AR 438-39.)  His GAF scale score at the time of his discharge was 55. (AR 436, 441, 556.)  Discharge notes indicate that "he emphatically denied that he [had] any desire or plans to harm his previous employer.  He is more focused on getting a new job and being able to keep his apartment." (AR 557.)  Plaintiff reported that he was in contact with numerous organizations to help with his financial problems, such as Fresno Workforce Connection, California Employment Development

Department ("CA EDD"), and the VA. (AR 558.) He also stated he had a case manager who assisted him with "Fair Employment and Housing regarding his employment situation." (AR 558.)

On October 27, 2005, Plaintiff began seeing Dr. L. Darrell Dunkel, a clinical psychologist for VA, for a group-oriented six-week stress- and anger-management class. (AR 790.) Plaintiff attended the initial session with 14 other participants. (AR 790.) Dr. Dunkel noted Plaintiff was cooperative, had a stress level of seven out of 10, and an anger level of eight out of 10. (AR 790.)

On October 31, 2005, Plaintiff called the VA telephone care to report elbow pain, which he described as a six out of 10. (AR 788-90.) He was unable to identify the injury that caused the pain and was referred to the emergency room if it did not get better. (AR 788-90.) Later that day, he presented at the Fresno VAMC for his elbow pain and was told to rest it and take over-the-counter ibuprofen for pain and inflammation. (AR 787-88.) Plaintiff also saw Ms. Jensen, who noted updates on his living situation: he was working with Legal Aid to fight an eviction; he was still unemployed but actively looking for work; and he would be returning for assistance with his pending VA pension claim. (AR 787.)

On November 15, 2005, Plaintiff completed an adult function report. (AR 108-15.) He stated that most of his daily activities involved appointments at the VA, legal issues related to housing and employment, and miscellaneous tasks related to social services, Workforce Connection, and his VA social worker. (AR 108.) He prepared his own meals on a daily basis, although he claimed that his condition reduced his ability to do so. (AR 110.) He continued to do household duties, such as cleaning, laundry, dishwashing, and outside chores, including light-duty yard work, watering the lawn, and sweeping. (AR 110-11.) He was able to walk, drive a car, and take public transportation when he went out. (AR 111.) He shopped on a weekly basis for household products. (AR 111.) His hobbies were watching sports, fishing, billiards, and travel, although he was limited to watching sports due to his lack of income. (AR 112.) He was able to socialize with others, including having phone conversations every two to three days and going to church and the VA hospital on a regular basis. (AR 112.) He listed a problem getting along with employers because they gave him grief and stress, and reported that he lost previous jobs because of unfair labor laws

against him.  (AR 113.)  He stated that his social activities are mainly with VA staff, and he has a short fuse for social activities.  (AR 113.)

On November 17 and 23, 2005, Plaintiff attended additional stress- and anger-management group sessions, and Dr. Dunkel noted that Plaintiff was cooperative.  (AR 784-85.)  On December 8, 2005, Plaintiff participated in a final stress- and anger-management group session.  (AR 776-77.)  Dr. Dunkel noted Plaintiff was cooperative, and he also had a stress level of seven out of 10, and an anger level of seven out of 10.  (AR 777.)  Dr. Dunkel also noted that Plaintiff reported having benefitted from the group, and he was invited to a weekly, ongoing stress- and anger- management group. (AR 777.) Following this session, however, Plaintiff reported to Ms. Jensen that he had been evicted the previous day and his son, who had been living with him, left to live in Arizona; he was actively endorsing suicidal ideation.  (AR 776.)  Ms. Jensen brought him to the VAMC emergency room for a mental health evaluation.  (AR 776.)

From December 8 to 13, 2005, Plaintiff was admitted to the Fresno VAMC for psychiatric treatment due to depression and suicidal ideation.  (AR 716-77.)  At the time he was admitted, Plaintiff was mainly described as "tearful," and the primary concern noted was his suicidal thoughts.  (AR 762, 768, 774, 776.)  In regards to his financial and legal problems, the examiner noted that "his accounts are often at odds with the reality as reported by the ex employer . . . . " (AR 774.)  During intake questioning, he mentioned that he did not participate in combat during his service in the Army, but had witnessed the death of fellow soldiers during military training and "expresse[d] feelings of guilt over not being able to prevent those deaths."  (AR 774.)  He claimed to have "occasional flashbacks[, but had] not been formally assessed for PTSD."  (AR 774.)  His GAF scale score at admission was 40.  (AR 774.)  He was reassessed approximately seven hours later, and his GAF scale score was 35.  (AR 768.)  A staff psychiatrist noted that he was "at risk for suicide if released due to recent homelessness."  (AR 768.)

During his inpatient treatment, Plaintiff was "found in [the] TV room watching Platoon" and had to be reminded that "war movies may be difficult [for] other patients to see or hear." (AR 744.)  He was diagnosed with major depression on December 10, 2005.  (AR 749, 743.)  He was

discharged and identified as "stable for outpatient management" on December 13, 2005. (AR 718, 723.) His GAF scale score at the time of his discharge was 70. (AR 649, 727.)

On January 12, 2006, Dr. Dunkel completed a form reporting that he had been treating Plaintiff from October 27, 2005, through January 6, 2006, "as needed" and diagnosed Plaintiff with Major Depressive Disorder ("MDD"). (AR 1094.) Dr. Dunkel observed that Plaintiff's symptoms included "dysphoria, anhedonia, impaired concentration, excessive guilt, suicidal thoughts [and posited that h]is symptoms prevent him from effectively attending to job-related tasks." (AR 1094.) Dr. Dunkel further claimed that Plaintiff was incapable of performing his regular work since October 27, 2005, but anticipated that he could return to work on July 12, 2006. (AR 1094.)

On February 15, 2006, Plaintiff attended a previously scheduled appointment with Dr. Neil Smith, a psychiatry resident at the Fresno VAMC.[2] (AR 706-09.) Plaintiff claimed to have nightmares and flashbacks. (AR 707.) Dr. Smith's notes indicate that he ruled out PTSD as a disorder, citing Plaintiff's financial situation, unemployment, and recurring nightmares as indicia of an adjustment disorder with depressed mood. (AR 708.) Plaintiff was assigned a GAF scale score of 65. (AR 708.)

On April 7, 2006, Dr. Cal VanderPlate, a non-examining state agency psychiatrist, completed a Mental Residual Functional Capacity ("RFC") Assessment of Plaintiff.[3] (AR 621-627.) Dr. VanderPlate found that Plaintiff was capable of understanding and remembering at least simple directions, capable of carrying out simple tasks, limited in pace and concentration but could maintain his attention for a two-hour period during an eight-hour workday and complete a normal workweek, somewhat restricted in dealing with others because of his history of depression and anger issues, capable of relating appropriately to others in social situations, able to accept supervision and deal

---

[2] All of Dr. Smith's notes and treatment recommendations were reviewed and approved by Dr. Nestor Manzano, Chief of Health Services.

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* 'In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

appropriately with criticism, and had no problems with adaptive skills. (AR 623.) Dr. VanderPlate concluded that Plaintiff's claimed limitations for stress, anxiety, and depression were only partially credible because they were not supported by medical evidence. (AR 627.)

On May 8, 2006, Plaintiff was seen by Dr. Smith for a follow-up appointment. (AR 703-05.) Plaintiff claimed to have recurring dreams with blurry faces that he did not recognize. (AR 704.) He was drinking more, purportedly in social situations, and had the need to "feel part of the group." (AR 704.) Dr. Smith added to his previous disorder identifications that Plaintiff may have an alcohol abuse problem or a dependency. (AR 704.) Dr. Smith again noted that PTSD had been ruled out as a diagnosis. (AR 704.) Plaintiff was given a GAF scale score of 70. (AR 705.)

On June 5, 2006, Dr. Smith saw Plaintiff for a scheduled follow-up appointment. (AR 692-96.) During this appointment, Plaintiff claimed to have "graduated from Fresno State with a dual major (one in Spanish) and has had many good jobs in the past." (AR 693.) Additionally, Plaintiff claimed to have "occasional nightmares but [did] not . . . elaborate on their content." (AR 693.) A loan discharge application form was discussed, and Plaintiff claimed that Dr. Dunkel "mentioned in the past that he was permanently disabled." (AR 693.) Plaintiff was given a GAF scale score of 64. (AR 695.)

On June 7, 2006, Dr. Smith indicated on a loan discharge form that Plaintiff was unable to work due to his depression. (AR 1093.) According to Dr. Smith, Plaintiff's "major depression disorder" prevented him from "work[ing] or earn[ing] income in any capacity." (AR 1093.) Dr. Smith noted that it was not known at that time if Plaintiff's disability was permanent. (AR 1093.)

On July 21, 2006, Dr. Dunkel indicated that he was still treating Plaintiff, with the last date of treatment on June 5, 2005. (AR 1092.) Dr. Dunkel noted Plaintiff's diagnosis as MDD and stated that his present condition prevented him from returning to work because "[i]t prevents him from adequately focusing on and [sic] performing work-related tasks." (AR 1092.) The only factor Dr. Dunkel listed as causing the extended disability was unemployment and estimated that Plaintiff should be able to return to work on January 21, 2007. (AR 1092.)

On August 14, 2006, Plaintiff saw Dr. Smith for a scheduled appointment. (AR 685-88.) Plaintiff brought his significant other to the appointment. (AR 687.) Plaintiff complained of having

1    more "ups and downs" in his moods and continued anxiety, and he continued to experience insomnia

2    and reported seeing "silhouettes," claiming that one was a person he knew who recently passed away,

3    but was unable to elaborate further.   (AR 686.)   His significant other stated Plaintiff was

4    experiencing tremendous amounts of anger, sometimes directed at her, and often seemed on edge.

5    (AR686.)  He expressed frustration that he was not understood.  (AR 686.)  Plaintiff admitted to

6    withdrawing or avoiding things that made his symptoms worse.  (AR 686.)  Dr. Smith gave him a

7    GAF scale score of 58 and again ruled out PTSD as a potential diagnosis.  (AR 687.)  Dr. Smith

8    added "current discord with significant other" to his Axis IV assessment.  (AR 687.)

9         On September 6, 2006, Plaintiff saw Dr. Smith for a scheduled appointment.  (AR 674-77.)

10   Plaintiff did not bring his significant other to this appointment, but mentioned that he thought she

11   was overwhelming and controlling.  (AR 675.)  Plaintiff presented a note from his significant other

12   requesting he be taken off some of his current medications.  (AR 675.)  He stated that he first wanted

13   to work on his PTSD symptoms in group therapy before considering any other treatment.  (AR 675.)

14   He continued to report seeing "silhouettes" at night and was able to identify most of them as people

15   he worked with and who had passed away, but did not understand what it meant.  (AR 675.)  He also

16   complained of chronic anxiety.  (AR 675.)  Dr. Smith gave him a GAF scale score of 54 and again

17   ruled out PTSD as a potential diagnosis.  (AR 676.)

18        On September 25, 2006, Dr. Smith completed a Department of Education form regarding

19   Plaintiff's previous application for loan forgiveness.  (AR 670-71, 1093.)  Dr. Smith noted that the

20   Department of Education was under the impression Plaintiff was permanently disabled, which Dr.

21   Smith denied and clarified that the extent or length of Plaintiff's disability was not known.  (AR

22   671.)

23        On September 28, 2006, Plaintiff returned to the Fresno VAMC to obtain a signature to

24   complete a form required to apply for general relief.  (AR 670.)  Plaintiff claimed that two items on

25   the form had not been checked and social services would not allow him to submit the application.

26   (AR 670.)  During the discussion with VA staff, Plaintiff claimed to be "unable to hold a job because

27   of mental health issues, not physical [sic] issues."  (AR 670.)  He also stated that "he gets angry and

28   short tempered, can't stand 'stupid people' and was fired for 'mouthing off' in June 2002. He [stated

he] has not been able to tolerate a work environment since that time." (AR 670.)  He further claimed to have "enemy images that intrude on his thoughts and his sleep is disturbed by them.  He has guilt and aggressive thoughts about enemy soldiers."  (AR 670.)  He expressed interest in attending a PTSD treatment program if he was diagnosed with that problem.  (AR 670.)

On November 15, 2006, Plaintiff saw Dr. Smith and reported having ongoing problems with his significant other and that she was a source of stress.  (AR 865.)  He was having a lot of ups and downs, depending on the situation, but overall remained stable.  (AR 865.)  He claimed to have insomnia, nightmares, depressed moods, and chronic anxiety.  (AR 865.)  Dr. Smith again ruled out PTSD as a diagnosis and gave Plaintiff a GAF scale score of 54.  (AR 866.)  Dr. Smith considered MDD, adjustment disorder with depressed mood, alcohol abuse or dependency, and dyssomnia as potential diagnoses.  (AR 866.)  Dr. Smith further noted, however, that he was considering prescribing Prazosin[4] for high blood pressure, which could also help with PTSD.  (AR 866.)

On December 1, 2006, Dr. Glenn Ikawa, a non-examining state agency psychiatrist, reviewed Dr. VanderPlate's mental RFC assessment, and completed a Psychiatric Review Technique Form (*see* 20 C.F.R. § 404.1520a).  (AR 795-810.)  Dr. Ikawa affirmed the findings of Dr. VanderPlate and specifically stated that he agreed that Plaintiff was able to complete simple, repetitive tasks with limited public contact.  (AR 795, 810.)

On December 18, 2006, Plaintiff saw Dr. Smith for a scheduled appointment.  (AR 851-54.)  Plaintiff remained depressed and indicated his disability claim denial had a negative affect on him.  (AR 852.)  He claimed to have some dizziness and stated that it was due to previous head traumas; he requested a Magnetic Resonance Imaging ("MRI") to determine if there was anything wrong with his brain.  (AR 852.)  He mentioned his upcoming appointment with Dr. Lynn Nile and "hope[d] he [could] wait that long."  (AR 852.)  Dr. Smith again ruled out PTSD as a potential diagnosis and gave Plaintiff a GAF scale score of 52.  (AR 853.)  While Dr. Smith had not come to a conclusion on Plaintiff's diagnosis, he did note again that Prazosin, which would be used for his blood pressure, may help with PTSD.  (AR 853.)  Dr. Smith discussed with Plaintiff that he would be leaving the clinic in January and encouraged him to meet with Dr. Nile for a follow-up appointment on January

---

[4] Prazosin is an oral blood pressure medication. *Dorland's Illustrated Medical Dictionary* 1529 (31st ed. 2007).

22, 2007. (AR 853.) On December 20, 2006, Plaintiff underwent a Computed Topography ("CT") scan, which revealed no significant intracranial or extracranial pathology for a person his age. (AR 832.)

On January 22, 2007, Plaintiff met with Dr. Nile, a treating attending psychiatrist at the Fresno VAMC. (AR 846-48.) Plaintiff reported nightmares three to four times a week and intrusive, traumatic memories occurring daily. (AR 847.) She noted that Plaintiff's depression was an eight out of 10 and that he was angry about being prematurely and wrongfully terminated. (AR 847.) Dr. Nile described Plaintiff as engaged with good eye contact and cooperative, but irritable, depressed, slightly agitated, anxious and stressed. (AR 847.) Dr. Nile also noted that Plaintiff was struggling financially, anxious, stressed, isolative, experiencing increased irritation, anger, frustration, and resentment, was hyper vigilant, had an exaggerated startle response, and decreased concentration. (AR 847.) Dr. Nile recorded PTSD as an active problem for Plaintiff. (AR 977.)

On March 19, 2007, Plaintiff saw Dr. Nile for a follow-up appointment to discuss his symptoms. (AR 1075.) He claimed to be angry and irritated at the world, more isolated, had intrusive traumatic thoughts daily, had passive thoughts of death or dying, fleeting thoughts of suicidal ideation, and nightmares four to five times per week. (AR 1075.) Dr. Nile reported that Plaintiff's additional symptoms included sleeping three to four hours per night, exaggerated startle response, hyper vigilance, and decreased concentration. (AR 1075.) Dr. Nile noted Plaintiff's PTSD as severe and MDD as recurrent, chronic, and moderate-to-severe, but she also indicated that his medications helped with his PTSD and depression. (AR 1075.)

On April 29, 2007, Plaintiff called the VA's after-hours medical advice and emergency phone number but refused to answer any triage questions. (AR 1058-60.) Plaintiff stated that the VA was not doing anything for veterans and he had been sensible and reasonable with them. (AR 1058.) He was told to go to the Fresno VAMC emergency room to speak with a psychiatrist. (AR 1058.) He stated he did not need to talk and hung up. (AR 1059.) The record reflects Dr. Nile reviewed this incident on April 30, 2007. (AR 1059.)

On May 3, 2007, Plaintiff went to the Fresno VAMC, but left before discussing any issues with anyone. A note states that Plaintiff had missed two appointments and was not returning phone

calls in regard to PTSD treatment and therapy.  (AR 1058.)  On May 8, 2007, Plaintiff completed assessments for a PTSD treatment program, his results were reviewed by the treatment team, and he was recommended to begin treatment in Dr. Jack Papazian's psycho-educational group. (AR 1057.)

On May 15, 2007, Plaintiff attended the first session of the PTSD psycho-educational group treatment program, led by Dr. Papazian. (AR 1052-53.)  Dr. Papazian noted that Plaintiff was interested and actively involved in group discussions, and his diagnostic impression of Plaintiff was PTSD. (AR 1052-53.)

On May 22, 2007, Plaintiff attended the second session of the PTSD group led by Dr. Papazian. (AR 1045-46.)  Dr. Papazian noted that Plaintiff was interested, actively involved in groups discussions, and his diagnostic impression was PTSD. (AR 1045-46.) Dr. Papazian reported his observations on May 29, 2007, when Plaintiff attended the third session. (AR 1038.)

On June 1, 2007, Plaintiff met with Dr. Nile for a follow-up appointment. (AR 1037.) Plaintiff discussed his PTSD group therapy and described it as helpful. (AR 1037.) Plaintiff claimed that his son was in legal trouble, which increased his own stress and anxiety.  AR 1037.)  He had nightmares a few times a week, had flashbacks 15-20 times per week, had daily intrusive and traumatic thoughts, and was experiencing an increase in his irritation and anger levels. (AR 1037.) Dr. Nile noted Plaintiff's PTSD as severe and his MDD as recurrent, chronic, and moderate. (AR 1037.)  She also noted that the medications helped with Plaintiff's depression and anxiety. (AR 1037.)

On June 12, 19, and 26, and July 10, 2007, Plaintiff attended the PTSD group lead by Dr. Papazian, who again noted that Plaintiff appeared interested, was actively involved in group discussions, and his diagnostic impression was PTSD.  (AR 1017-18, 1034-35.)  After his final group session, Dr. Papazian referred Plaintiff to Dr. Dunkel's PTSD/Anxiety Management group. (AR 828.)

On July 10, 2007, Plaintiff was fitted with hearing aids and provided an examination to determine his functional gain and speech audiometry. (AR 1016.)  He was instructed on how to manipulate the volume and program controls of the hearing aids, as well as general use and care for the devices. (AR 1016.)  His functional gain was not significant, but his speech audiometry was

1  beneficial because his speech discrimination improved from 68% at 70 dB to 92% at 55 dB.  (AR

2  1016.)

3         On September 7, 2007, Dr. Nile prepared a Mental RFC Assessment for Plaintiff, and she

4  indicated that Plaintiff had marked limitations in interacting socially and in sustaining concentration

5  and persistence.  (AR 1096-97.)  Dr. Nile's diagnosis was severe PTSD and recurrent, moderate

6  MDD, based on a psychiatric diagnostic interview and psychotherapeutic interventions.  (AR 1097,

7  1098.)  Dr. Nile opined that Plaintiff's disorders "cause[] him to have marked limitations socially,

8  personally, emotionally and occupationally."  (AR 1098.)  She opined that these restrictions existed

9  since his first mental health visit to the Fresno VAMC on November, 29, 1999.  (AR 1097.)

10        On September 20, 2007, Plaintiff met with Dr. Nile for a follow-up appointment.  Plaintiff

11  claimed to be frustrated, irritated, "losing hope" about getting benefits for PTSD, depressed, and

12  angry.  (AR 1099.)  Dr. Nile noted specifically that Plaintiff "[c]ontinues to exhibit severe PTSD

13  symptoms, including daily intrusive, traumatic memories, flashbacks 15-20 times per week [sic],

14  nightmares few times per week [sic], inc[reased] irrit/anger, dec[reased] STM/conc., hypervigilant,

15  exag. startle, broken sleep (3-4 hrs.)."  (AR 1099.)  Dr. Nile opined that Plaintiff's PTSD was severe

16  and disabling, rendering him permanently disabled and unemployable.  (AR 1099.)  Additionally,

17  she noted his MDD to be recurrent, chronic, and moderately severe.  (AR 1099.)  She also noted that

18  Plaintiff was engaged during appointments, made good eye contact, and cooperative.  (AR 1099.)

19        On October 5, 2007, Dr. Nile stated that Plaintiff's PTSD permanently reduced his ability

20  to engage in work, but the onset date was unknown.  (AR 1108-09.)  Her diagnosis was PTSD and

21  recurring, moderately severe MDD.  (AR 1109.)[5]

22  **B.     Third Party Lay Statements**

23        In a letter dated November 16, 2006, Robert Kovar, Plaintiff's friend of approximately 15

24  years, wrote that he watched Plaintiff "go from a mild tempered person very quiet in demeanor to

25  a person who is on edge and short tempered."  (AR 139.)  Mr. Kovar stated that he had to watch what

26  he said to Plaintiff because anything can upset him.  (AR 139.)  He stated that Plaintiff's continuous

27

28        [5] The October 5, 2007, form completed by Dr. Nile regarding Plaintiff's eligibility for general relief was not
provided to the ALJ prior to the hearing.  Rather, it was submitted to the Appeals Council as an exhibit to Plaintiff's
request for review of the ALJ's December 13, 2007 decision.

references to military service were evidence of some deep scars left on his personality.  (AR 139.)
He posited that Plaintiff's mind-set prevented him from "ever hold[ing] down a meaningful job."
(AR 139.)

In a letter dated November 20, 2006, Maro Alpoonarian, Plaintiff's acquaintance of an
unknown period, described Plaintiff's PTSD symptoms.  (AR 140-41.)  Mr. Alpoonarian, an English
teacher, claimed that Plaintiff exhibited very disturbing behavior on a daily basis, including
impairments in his "ability to think, communicate, remember (short and long term), interact socially,
groom himself appropriately, keep appointments (must be reminded in writing), and remember time
and place."  (AR 140.)  Mr. Alpoonarian attributed Plaintiff's extreme social isolation to hearing
loss, which he claimed also caused disorientation, confusion in judgment, and affected Plaintiff's
ability to communicate with others.  (AR 140.)  Mr. Alpoonarian noted Plaintiff's very poor impulse
control, citing numerous occasions Plaintiff would respond with violence due to "other people's
driving or even 'looking' at him the wrong way."  (AR 141.)  Mr. Alpoonarian stated Plaintiff had
a very difficult time remembering simple things, specifically that Plaintiff knew very little about his
childhood through the present and he could not remember names of family members or details of
his work history.  (AR 141.)  Mr. Alpoonarian opined that Plaintiff was permanently unemployable
due to his "very serious mental, social, and physical health problems."  (AR 141.)

## C.   Administrative Proceedings

The Commissioner denied Plaintiff's applications initially and again on reconsideration.  (AR
56-60, 64-68.)  Consequently, on September 8, 2007, Plaintiff requested a hearing before an
Administrative Law Judge ("ALJ"), which was granted.  (AR 35-40.)  A hearing was held on
October 18, 2007, before ALJ James P. Berry.  (AR 1121-51.)  Plaintiff and a Vocational Expert
("VE") testified.  (AR 1121-51.)  Plaintiff was represented by an attorney at the hearing.  (AR 1121-
51.)

### 1.   Plaintiff's Testimony

Plaintiff testified that he had completed at least two years of college, but did not receive a
degree or certificate as a result.  (AR 1126.)  He obtained a real estate principles certificate for
completing a class presented by Century 21 in 2003, although it did not entitle him to do anything

with it; it was merely a certificate. (AR 1126.) His last job was in September 2005 with JFM Management Company, where he worked in maintenance and landscaping. (AR 1126, 1128.) He claimed to have been promised the position of resident manager, but worked for only three weeks until arguing with his boss over the position and getting fired. (AR 1128.)

Plaintiff's preceding job was for Scott Ellis for approximately four months, ending in July 2005. (AR 1128.) He was a resident manager/property manager and was responsible for office management, leasing, renting, vending, scheduling, and staff scheduling. (AR 1129.) He was fired from this position because he allegedly misplaced $100. (AR 1129.) His also worked for Manco Abbott, a property and real estate management company, for approximately eight months, ending sometime in 2003 or 2004. (AR 1129-30.) At Manco Abbott, he was the resident manager/property manager for an apartment complex, the Reserves, and "a floater," scheduled to work at eight properties throughout the week. (AR 1129.) He was fired from this position for questioning why he never received his own property to manage, since he had spent nearly the entire time as a floater. (AR 1130.) He then worked for the Reserves, LLC for approximately six months and left because the sales and marketing were low. (AR 1130.) He testified that the Reserves, LLC wanted to try someone else in the position because he could not rent the properties. (AR 1130.)

Plaintiff testified that he had at least 10 temporary and 40 other jobs from 1990 to 2005. (AR 1130-31.) During 2000 and 2001 he was the general manager of Motel 6, overseeing the property, auditing, bookkeeping, scheduling, vending, and handling customer service. (AR 1131.) He was fired from this position for arguing with the area manager, with whom he had "problems." (AR 1131.)

Plaintiff testified that he had physical medical problems, including hearing loss, elbow, wrist surgeries, and left elbow complications. (AR 1132.) He claimed his left elbow limited his ability to lift and carry and believed he could only lift and carry 10 pounds occasionally as a result. (AR 1132.) He had been prescribed hearing aids for hearing loss. (AR 1132.) He was also in treatment for mental problems, which he asserted were PTSD and mental medical disorder, anxiety and depression. (AR 1132-33.)

Plaintiff testified that he began going to the VAMC in Los Angeles, California, in 1999 for PTSD. (AR 1134.) He claimed that his PTSD affected his moods – changing his temperament quickly, his ability to socialize or get along with people, and his nervousness. (AR 1134.) He also claimed to have nightmares and depression, which caused suicidal thoughts and being upset with the world. (AR 1135.) His mental problems caused him to be terrified and rendered him angry and unable to communicate or function. (AR 1136.)

He is able to lift a maximum of 10 to 15 pounds but can carry 10 pounds fairly comfortably. (AR 1140.) He is able to sit for a maximum of six to six-and-a-half hours, stand for less than an hour, and walk for an hour or less. (AR 1141.) Plaintiff's normal day included waking up and making toast and coffee, watching television until noon, eating a sandwich, taking a brief walk, sitting and thinking, watching more television, taking his medication, and going to bed. (AR 1142.)

### 2.    Vocational Expert's Testimony

The VE characterized Plaintiff's past relevant work as a manager of an apartment facility, a combination of office and residential manager, as light,[6] based on the DOT listing, but heavy[7] as performed because the work involved lifting 50 to 75 pounds. (AR 1145.) His positions at the hotel and in landscape maintenance were considered medium.[8] (AR 1145.) Some of Plaintiff's acquired skills included computer usage for bookkeeping and account recordkeeping, handling money transactions, dealing with people, such as customers and tenants, and maintaining accurate financial records. (AR 1145.) These skills were primarily related to his past work and would be transferrable to light and sedentary work.[9] (AR 1145.)

The VE considered several hypotheticals proposed by the ALJ. The VE testified that a hypothetical person of the same age and with the same education and past work experience as

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[7] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

[8] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

Plaintiff with a combination of severe impairments but who retains the ability to lift and carry 100 pounds occasionally and 50 pounds frequently; stand, walk, and sit six to eight hours each day; perform simple repetitive tasks, maintain attention, concentration, persistence, and  pace; interact with and/or relate to others; adapt to usual changes in work settings and adhere to safety rules; but is limited to only occasional contact with the general public, could not perform Plaintiff's past relevant work.  (AR 1146.)  However, jobs in the national or regional economy existed that a hypothetical person with these limitations could perform, at the unskilled heavy level, including vehicle/equipment cleaner, freight laborers, stockers, and material handlers, and hand packer.  (AR 1146-47.)  Given these limitations, there would be 5,800 jobs in the vehicle/equipment cleaner category, 80,000 jobs in the freight laborers, stockers, and material handlers category, and 9,000 jobs in the hand packaging category in the regional economy.  (AR 1147.)  There would be roughly nine to 10 times as many jobs in the national economy.  (AR 1147.)

A second hypothetical person of the same age and with the same education, past work experience, and a combination of severe impairments who was able to lift 10 to 15 pounds occasionally and carry less then10 pounds frequently; stand less than one hour each day, walk one hour or less each day, and sit six-and-one-half hours each day; but who had difficulty maintaining attention, concentration, persistence, and pace; difficulty relating to or interacting with others; difficulty adapting to usual changes in work settings; and difficulty adhering to safety rules, could not perform Plaintiff's past relevant work.  (AR 1147.)  There would be no jobs existing in the national economy for such a person to perform.  (AR 1147-48.)

A third hypothetical person with the same limitations as the first, but who must avoid concentrated exposure to loud noise would be able to perform alternative work.  (AR 1148.)  Although the number of jobs was eroded given the noise limitation, there were still 40,000 jobs in freight laborers, stockers, and material handlers category, and 9,000 jobs in the housekeeping category in California.  (AR 1148-49.)

A fourth hypothetical person with the same limitations as the first who could not maintain attention and concentration for an extended period of time would not be able to perform work.  (AR 1149-50.)

A fifth hypothetical person with the same limitations as the first who could not perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances would not be able to perform any job.  (AR 1150.)

A sixth hypothetical person with the same limitations as the first who could not work in coordination with or in proximity to others without being distracted would not be able to perform any job.  (AR 1150.)

A seventh hypothetical person with the same limitations as the first who could not work without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods would not be able to perform any jobs.  (AR 1150.)

An eighth hypothetical person with the same limitations as the first hypothetical person who has marked limitations in the ability to accept instructions and to respond appropriately to criticism from supervisors would not be able to perform any jobs.  (AR 1151.)

### 3.     ALJ's Decision

On December 13, 2007, the ALJ issued a decision finding Plaintiff not disabled from January 1, 2003, through the date of his decision.  (AR 25, 32-33.)  The ALJ found that Plaintiff (1) meets the insured status requirements of the Act through December 1, 2008, (2) has not engaged in substantial gainful activity since January 1, 2003, (3) has three severe impairments: PTSD, depression, and hearing loss, (4) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (5) is unable to perform his past relevant work; but (6) has the ability to perform alternative work in the national economy.  (AR 27-32.)

Plaintiff sought review of this decision with the Appeals Council on January 22, 2008.  (AR 19.)  The Appeals Council denied Plaintiff's request on December 4, 2009.  (AR 10.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

**D.    Plaintiff's Contentions on Appeal**

On April 13, 2010, Plaintiff filed a complaint for review of the ALJ's decision.  (Doc. 1.)[10] Plaintiff argues that the ALJ erred by (1) failing to assess him with a "*Gatliff* disability"; (2) improperly rejecting the opinions of Drs. Nile, Dunkel, and Smith; (3) improperly rejecting Plaintiff's testimony; (4) improperly assessing Plaintiff's RFC, (5) failing to properly establish existing jobs at Step Five in the disability evaluation process, and (6) failing to find the proper date last insured.  (Doc. 15, at 6-15.)

## III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or

---

[10] On March 9, 2010, the Appeals Council granted Plaintiff a 30-day extension of time to file a civil action in district court.  (AR 5-6.)

mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform his past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.  DISCUSSION

### A.   Issues Requiring Remand

Although the Court typically addresses the parties' arguments in a sequence that mirrors the five-step sequential analysis, there is an obvious error in the Fifth Step that requires remand.  There is no argument raised that Plaintiff should have been awarded benefits at the Third Step, and the ALJ

1  determined that Plaintiff was unable to perform his past relevant work in the Fourth Step; therefore,

2  the disability determination necessarily turns on the Commissioner's decision in the Fifth Step.

3  Thus, the Court will address the error in the Fifth Step as an initial matter and then provide a

4  discussion of the remainder of the parties' arguments.

5         **1.**      **The Agency's Burden of Establishing Alternative Work at the Fifth Step**

6        At the Fifth Step of the sequential analysis, the burden shifts to the Commissioner to show

7  that the claimant can perform other jobs that exist in the national economy. *Bray v. Comm'r of Soc.*

8  *Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).   There are two ways for the Commissioner to

9  satisfy this burden: "(1) by the testimony of a vocational expert, or (2) by reference to the Medical

10  Vocational Guidelines [the "Grids"] at 20 C.F.R. p. 404, subpt. P, app. 2." *Tacket*, 180 F.3d 1094,

11  1099 (9th Cir. 1999).   The Commissioner "must 'identify specific jobs existing in substantial

12  numbers in the national economy that [the] claimant can perform despite her identified limitations.'"

13  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999).

14             **a.**      **VE Testimony Regarding Alternative Work Plaintiff Could Perform**

15        The VE testified that a hypothetical person of the same age and with the same education and

16  past work experience as Plaintiff with a combination of severe impairments and who retains the

17  ability to lift and carry 100 pounds occasionally and 50 pounds frequently; stand, walk, and sit six

18  to eight hours each day; perform simple repetitive tasks; maintain attention, concentration,

19  persistence, and pace; interact with and/or relate to others; adapt to usual changes in work settings

20  and adhere to safety rules; but who is limited to only occasional contact with the general public,

21  could perform work at the unskilled, heavy level in the following jobs: (1) vehicle/equipment

22  cleaner; (2) freight laborers, stockers, and material handlers; and (3) hand packaging. (AR 1146-47.)

23  When this hypothetical person was required to avoid concentrated exposure to loud noise, the VE

24  testified that there would be no jobs that could be performed in the category of vehicle/equipment

25  cleaner, 50 percent of the jobs in the category of "freight laborers, stockers, and material handlers"

26  would be eroded, and there were jobs in the category of "housekeeper" that could be performed, but

27  those too would be reduced by 50 percent due to the noise limitation.   (AR 1148.)   These job

28  categories were identified by the VE as unskilled.   (AR 1147, 1148.)

**b.      The Parties' Arguments Regarding the VE Testimony**

Plaintiff argues that determining whether the testimony of the VE is consistent with the Dictionary of Occupational Titles ("DOT") is hampered by the fact that the VE did not provide DOT numbers for the occupations about which she testified. (Doc. 15, 12:6-12 n.9 (due to VE's failure to specify DOT numbers that correspond to the jobs the VE identified, "[a]ppellant is forced to guess, therefore, which occupational descriptions should be examined").)  Plaintiff further asserts that, even to the extent he can hypothesize which jobs identified by the VE are comparable to particular DOT job titles, any comparable jobs in the DOT exceed his limitation for "simple repetitive tasks."   For example, Plaintiff asserts that the DOT description of job title "laborer, general," DOT 909.687-014, involves the performance of a variety of tasks and thus requires more than the ability to perform only simple, repetitive tasks.  Likewise, the DOT job title "cleaner, housekeeping," DOT 323.687-014, requires the performance of duties that are not limited to simple and repetitive tasks.

Defendant asserts that Plaintiff is not competent to offer an opinion regarding whether tasks listed in a DOT job description are of a simple or more complex nature. Rather, Defendant asserts that it is the Specific Vocational Preparation ("SVP") level of the job that identifies its complexity. Jobs that are classified by the DOT as SVP level 2 correspond to the Commissioner's definition of unskilled work.  Unskilled work is that which requires the mental ability to perform simple tasks. Thus, jobs that are rated as SVP level 2 require the ability to perform simple tasks which is consistent with Plaintiff's RFC for simple, repetitive tasks.  The jobs identified by the VE were all rated SVP level 2.  Defendant also asserts that, in any event, all of the DOT job titles identified by Plaintiff are "speculative" because the VE did not provide a DOT number.  Defendant declines to concede that Plaintiff's hypothesized DOT job titles are a correct characterization of the VE's testimony.  (Doc. 17, at 19:21-22.)

**c.      The Agency Failed to Meet its Burden of Establishing Alternative Work**

There are several factors that indicate the Commissioner has not satisfied the burden at the Fifth Step.  First, Plaintiff is correct that no DOT numbers are provided by the VE.  "Freight laborers, stockers, and material handlers" is not a category of job titles identified in the DOT, nor

is "freight laborers," by itself, a cognizable DOT job category.  Plaintiff identifies a DOT job title of "laborer, general," DOT 909.687-014, that might be comparable, but the Court notes there are other DOT job titles to which the VE could conceivably been referring, including  "laborer, stores," DOT 922.687-058, and "material handler," DOT 929.687-030.  Likewise, the job title "housekeeper" identified by the VE might refer to "cleaner, housekeeping," DOT 323.687-014, as Plaintiff suggests, or it might refer to "cleaner II," DOT 919.687-014, or "housecleaner," DOT 381.687-018.  Defendant highlights the ambiguity by essentially asserting that Plaintiff cannot show that any of the jobs are in conflict with the DOT because he is only "speculat[ing]" with regard to which jobs the VE was actually referring during the hearing.  (Doc. 17, 19:19-21 ("Second, neither the vocational expert nor the ALJ provided numbers from the [DOT], so Plaintiff's reference to certain job titles in the [DOT] is speculative at best.").)

The Court is not positioned to review every job title in the DOT to which the VE could *potentially* have been referring in her testimony.  Defendant maintains that Plaintiff is only guessing as to the VE's job testimony, and the Court notes that, without DOT numbers, the Court's review would be reduced to similar hypothesizing.  This is so because, as pointed out above, there is no ready and easy match between the job titles the VE identified and job titles identified in the DOT. The VE's testimony is ambiguous and not conducive to judicial review.  *See Khon v. Barnhart*, No. Civ. A. 03-5122, 2004 WL 2203740, at * 11-* 12 (E.D. Pa. Sept. 3, 2004) (holding burden at Fifth Step not satisfied where VE provided the wrong DOT number in testimony and court refused to speculate to which job the VE was referring).

Second, while the ALJ recited that the VE's testimony was consistent with the DOT, the hearing testimony does not reflect that the VE was ever questioned regarding whether her testimony conflicted with the DOT.  This procedural error can hardly be found harmless because neither the parties nor the Court can accurately determine regarding which jobs the VE gave testimony without the corresponding DOT numbers.  Thus, it cannot be ascertained whether the VE's testimony is consistent with the DOT.  *See Massachi v. Astrue*, 486 F.3d 1149, 1152-53 (9th Cir. 2007).

Third, the ALJ incorrectly identified "hand packers" in the Fifth Step of the analysis as a job that Plaintiff could perform pursuant to the VE's testimony.  (AR 32.)  However, the VE did not

1  identify "hand packer" in response to the ALJ's hypothetical that presupposed a person who "must
2  avoid concentrated exposure to loud noise," which was ultimately a limitation the ALJ identified in
3  Plaintiff's RFC.  (AR 30, 1148.)  Given that limitation, the VE testified that jobs in the category of
4  "laborers, freights, stockers, and material movers" would be reduced by approximately 50 percent.
5  (AR 1148.)  In response to the ALJ's question whether there would be any other jobs that would fit
6  the hypothetical, the VE responded that "under maids and housekeepers there is a total base of
7  18,000 for unskilled heavy," which would be reduced by 50 percent given the limitation. (AR 1148.)
8  "Hand packer" was not a job title the VE identified given Plaintiff's limitation for avoiding
9  concentrated exposure to loud noise; thus it should not have been considered at the Fifth Step as
10  other work that Plaintiff could perform.

11         For all of these reasons, the Court concludes that the Commissioner did not satisfy the burden
12  of establishing there was other work that Plaintiff could perform given his limitations.  The matter
13  must be remanded for additional VE testimony that clarifies these issues and provides appropriate
14  DOT numbers for any jobs identified by the VE.

15         **2.      Plaintiff's "Date of Last Insured" is December 31, 2010**

16         Plaintiff argues that the ALJ erroneously found that Plaintiff's date of last insured was
17  December 31, 2008.  (Doc. 15, at 13-14.)  Plaintiff points out that the "DISCO DIB Insured Status
18  Report" indicates that Plaintiff's date of last insured was actually December 31, 2010.  (AR 76.)
19  Plaintiff asserts that the error should be corrected because, if it were allowed to stand, it would
20  prejudice any future applications for benefits that Plaintiff may file.

21         Defendant concedes that December 31, 2008, is not the correct date of last insured; rather,
22  Plaintiff is correct that the date of last insured is December 31, 2010.  (Doc. 17, at 20:22-25.)
23  Defendant asserts, however, this error is not prejudicial to the current disability decision because
24  both dates come well after the date of disability considered for purposes of this appeal.

25         While this error is not prejudicial to *this* disability determination, the matter is being
26  remanded for further proceedings, and this error should be corrected by the ALJ.

27
28

**B.      Weight of the Medical Evidence**

The ALJ found Plaintiff was able to perform simple repetitive tasks, maintain attention, concentration, persistence and pace, relate to and interact with others so long as it involved little public contact, and adapt to usual changes in work settings. (AR 29.)  The ALJ supported this RFC assessment by giving weight to the opinions of non-treating, non-examining physicians VanderPlate and Ikawa and discrediting the opinions of treating physicians Nile, Dunkel, and Smith. (AR 29-30.) Plaintiff argues Drs. Nile, Dunkel, and Smith's opinions were rejected without legally sufficient reasons and that these opinions should be given dispositive weight because they were rendered by treating psychiatrists. (Doc. 15, at 7-8.)  The Commissioner contends that the ALJ properly assessed these doctors' opinions and provided sufficient reasons to reject them.  (Doc. 17, at 13-17.)

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id*.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  *Id*.

**1.      The ALJ's Consideration of Dr. Nile's Opinion**

Plaintiff asserts that the ALJ discounted Dr. Nile's opinion that Plaintiff had marked limitations in several areas by improperly focusing on GAF scale scores from other psychiatrists. (Doc. 15, at 7:8-13.)  The Commissioner contends that the ALJ appropriately considered the GAF scores and permissibly determined that the scores were inconsistent with Dr. Nile's opinion that Plaintiff had marked limitations in social functioning and maintaining concentration, persistence, and pace.  (Doc. 17, at 15:13-24.)

Dr. Nile opined that Plaintiff had marked limitation in his ability to sustain concentration and persistence and had marked difficulty in his ability to interact appropriately with the public,

accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (AR 1097.)

The ALJ determined that Dr. Nile's conclusions about the severity of Plaintiff's limitations in concentration, persistence, and social functioning were at odds with the many GAF scores assigned to Plaintiff over the course of several years that indicated he was functioning fairly well overall.

"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health-illness." *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (citation and internal quotation marks omitted) (quoting *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. Am. Psychiatric Ass'n 1994) ("DSM-IV"). The GAF scale contains a range of scores that numerically describe a person's mental functioning: scores between 70 - 61 represent some mild symptoms or some difficulty in social or occupational functioning, but "generally functioning pretty well," with some meaningful interpersonal relationships; scores between 60 - 51 represent moderate symptoms or a moderate difficulty in social or occupational functioning; scores between 50 - 41 represent serious symptoms, such as suicidal ideation, any serious impairment in social or occupational, such as the inability to keep a job; scores between 40 - 31 represent some impairment in reality testing or communication or major impairment in several areas, such as work, family relations, judgment, thinking, or mood (e.g., the inability to work.).  DSM-IV at 34.

While GAF scale scores are not dispositive of a claimant's functioning, 65 Fed. Reg. 50746, 50746-65, *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury* (Aug. 21, 2000), they may be helpful and are "a piece of evidence to be considered with the rest of the record." *Olds v. Astrue*, No. 07-1079 MLB, 2008 WL 339757, at *4 (D.Kan. Feb. 5, 2008) (citing *Petree v. Astrue*, 260 Fed.App'x. 33, 42 (10th Cir. 2007)); *see also Baker v. Astrue*, No. CV 08-3199-MLG, 2009 WL 279085, at *3 (C.D. Cal. Feb. 4, 2009).  Here, the ALJ discussed GAF scale scores assigned to Plaintiff over time and found that they were consistently between 51 - 70, which represents, at worst, moderate symptoms and difficulty functioning.  The ALJ observed that

beginning in October 2003 and extending to December 2006, Plaintiff was assessed GAF scale scores of 68 (173), 45 (AR 574), 55 (AR 436, 441, 556), 40 (774), 70 (AR 649, 727), 65 (AR 708), 70 (AR 705), 64 (AR 695), 58 (AR 687), 54 (AR 676), 54 (AR 866), and 52 (AR 853) by various mental health providers.  (AR 29.)

Further, the ALJ observed that the lowest scores were assessed when Plaintiff was hospitalized for psychiatric care, and the scores were higher within a few days at discharge.  (AR 29.)  The ALJ noted that Plaintiff had been treated entirely as an outpatient after these episodes of decompensation, inferring that these lower scores were not indicative of Plaintiff's overall mental functioning.  (AR 29.)  Additionally, the ALJ attributed a drop in GAF scale scores in late 2006 to "discord with significant other," an observation also made by Plaintiff's treating psychiatrist at the time.  (AR 29, 687.)  The ALJ concluded that Plaintiff's GAF scale scores were consistently in the moderate to mild range and did not reflect the marked limitations Dr. Nile opined.  (AR 29.)  The ALJ properly considered Plaintiff's GAF scale scores in rejecting Dr. Nile's opinion.  *See Baker*, 2009 WL 279085, at *3 ("a GAF score may help guide the ALJ's determination" of the severity of a claimant's mental impairments).

Moreover, the ALJ did not reject Dr. Nile's opinion solely on inconsistencies with the longitudinal GAF scale scores.  The ALJ found Dr. Nile's opinion that Plaintiff had marked limitations in social functioning inconsistent with her own treatment notes and other medical records.  (AR 29.)  The ALJ specifically explained that Dr. Nile's notes described Plaintiff as engaged and cooperative with good eye contact (AR 29, 1037, 1075, 1083, 1099), Plaintiff completed an adult function report that indicated no problems with completing tasks or finishing what he starts (AR 29, 113), Plaintiff's behavior was noted to be cooperative in group therapy settings (AR 29, 777, 780, 782, 785, 786, 790), and he was actively involved in group therapy discussions (AR 29, 828, 1012, 1017, 1034, 1038, 1046, 1052).  The ALJ viewed this evidence as inconsistent with Dr. Nile's opinion that Plaintiff had marked limitations in social functioning as well as marked limitations in the area of concentration, persistence, or pace.  As the ALJ specifically discussed how the medical evidence and treatment notes were inconsistent, this is a specific and legitimate basis to reject Dr. Nile's opinion.  *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (conclusions inconsistent

1   with findings are reason to discount a medical opinion); *see also Rollins v. Massanari,* 261 F.3d 853,

2   856 (9th Cir. 2001).

3          Additionally, the ALJ discredited Dr. Nile's opinion that Plaintiff had marked limitations in

4   social functioning because Plaintiff reported regular interactions with friends and family as well as

5   attending church.  (AR 29, 108-15.)  A claimant's daily activities are appropriate bases to discount

6   a treating physician's opinion.  20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Morgan v. Comm'r*

7   *of the Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999).  Plaintiff's reported social functioning

8   supports an inference that his social limitations were not as marked as Dr. Nile opined.  When the

9   record is viewed as a whole, Plaintiff's regular social activities are an additional factor to be weighed

10  against Dr. Nile's finding of marked limitations in social functioning.  The ALJ properly considered

11  Plaintiff's regular social activities in weighing the medical opinion of Dr. Nile.

12         Plaintiff asserts that the ALJ did not afford proper deference to Dr. Nile's opinion as a

13  treating psychiatrist.  (Doc. 15, at 7:14-15.)  However, even a treating psychiatrist's opinion is not

14  binding, and the ALJ may reject it with legally sufficient reasons supported by substantial evidence.

15  *Lester*, 81 F.3d at 830.  Plaintiff also asserts that the ALJ improperly expressed doubt about the basis

16  for the PTSD diagnosis.  (Doc. 15, at 7:16-19.)  The ALJ determined that Plaintiff's PTSD was a

17  severe impairment; thus, whatever doubts the ALJ had about the diagnosis were resolved in

18  Plaintiff's favor.  (AR 27.)  Moreover, the ALJ did not articulate this doubt as a reason to reject Dr.

19  Nile's opinion.[11]

20         In sum, the ALJ provided "specific and legitimate" reasons supported by substantial evidence

21  to discount Dr. Nile's opinion, and the ALJ did not err in rejecting Dr. Nile's opinion.

22         **2.      The ALJ Properly Considered the Opinion of Dr. Dunkel**

23         Plaintiff asserts that the ALJ improperly failed to give weight to Dr. Dunkel's opinions that

24  Plaintiff was unemployable and disabled.  (Doc. 15, at 7-8.)  The Commissioner contends that the

25  ALJ rejected Dr. Dunkel's opinions because they did not specify any limitations, and Dr. Dunkel was

26  not competent to provide an opinion related to Plaintiff's vocational status.  (Doc. 17, at 16:2-21.)

27

28         [11] Dr. Smith ruled out PTSD as a diagnosis on several occasions; thus, Dr. Nile and Dr. Smith appeared to share a different view of Plaintiff's PTSD diagnosis.  (AR 676, 866.)

The ALJ considered Dr. Dunkel's January 12, 2006, statement that Plaintiff was incapable of performing his regular or customary work due to depression and stated that Plaintiff's anticipated release to return to work was July 12, 2006. (AR 30, 1094.) The ALJ also considered Dr. Dunkel's July 21, 2006, supplemental statement indicating that Plaintiff was disabled and could not return to regular or customary work until January 21, 2007. (AR 1092.) On both of these forms, the ALJ found that Dr. Dunkel had failed to state any specific mental limitations that precluded Plaintiff from working.

Plaintiff argues that the ALJ ignored the portion of Dr. Dunkel's opinion that provided specific findings to support his opinion. (Doc. 15, at 8:5-10.) In a portion of the form, Dr. Dunkel listed the following findings outlining the nature and severity of Plaintiff's condition: "Dysphoria, anhedonia, impaired concentration, excessive guilt, suicidal thoughts. His symptoms prevent him from effectively attending to job-related tasks." (AR 1094.) While Dr. Dunkel listed these characteristics, he did not explain how these characteristics precluded all work activity. "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Moreover, the ALJ noted that Dr. Dunkel's opinion addressed Plaintiff's ability to return to his *regular or customary* work. The ALJ agreed that Plaintiff's mental impairments prevent him from performing any past relevant work, but this did not support a conclusion that Plaintiff was precluded from any kind of work. Finally, the ALJ reasoned that Dr. Dunkel's opinion about Plaintiff's ability to work "addressed a vocational issue pertaining to the requirements of the [Plaintiff's] past work which is beyond Dr. Dunkel's field of expertise." (AR 30.) Medical source opinions that a person is "disabled" are administrative findings reserved for the Commissioner alone and are not considered medical opinions. 20 C.F.R. §§ 404.1527(e); 416.927(e). The ALJ was entitled to reject Dr. Dunkel's opinion regarding Plaintiff's ability to work as a non-medical conclusion. These were specific and legitimate reasons to reject Dr. Dunkel's opinion.

### 3.      The ALJ Properly Considered the Opinion of Dr. Smith

Plaintiff asserts that the ALJ improperly failed to give weight to Dr. Smith's opinion that Plaintiff was unable to work. (Doc. 15, at 7-8.) The Commissioner contends that the ALJ properly rejected Dr. Smith's opinion because it was inconsistent with his own progress notes. (Doc. 17, at 16:22-17:4.)

The ALJ determined that Dr. Smith's conclusion that Plaintiff's mental impairment prevented him from working was inconsistent with the physician's progress notes assigning a GAF score of 64 that, pursuant to the DSM-IV, indicates "only mild symptoms or some difficulty in functioning, but generally functioning pretty well." (AR 30, 692-95.) Additionally, the ALJ observed that "Dr. Smith did not know when [Plaintiff's] condition began or whether it was permanent," yet Dr. Smith opined that Plaintiff was precluded from working; thus Dr. Smith's opinion was not adequately supported. (AR 30, 1093.) A medical source's conclusion that is inconsistent with the findings is reason to discount a medical opinion. *See Young v. Heckler*, 803 F.2d at 968; *see also Rollins v. Massanari,* 261 F.3d at 856. Moreover, an opinion that a person cannot work or is disabled is a finding reserved for the Commissioner and is not a medical opinion entitled to deference. 20 C.F.R. §§ 404.1527(e); 416.927(e). The ALJ provided legally sufficient reasons for rejecting Dr. Smith's opinion that are supported by substantial evidence.

### 4.      Conclusion

In sum, the opinions of Plaintiff's treating physicians were not given weight for specific and legitimate reasons. Rather, the opinions of the non-examining state agency physicians were given weight by the ALJ, and the ALJ properly concluded that Plaintiff had (1) mild restriction in the area of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence or pace; and (4) one or two episodes of decompensation. The ALJ's conclusion reflected the findings of Dr. VanderPlate (AR 623) and Dr. Ikawa (AR 795-810). The ALJ determined that the longitudinal GAF scores reflected only mild to moderate limitations, Plaintiff's own statements of his concentration and persistence indicated little limitation, and Plaintiff's daily activities and regular interactions with doctors and others in group therapy sessions

1   evidenced that his social functioning was only mildly limited.  Thus, the non-examining state agency

2   physicians' opinions were accepted together with other consistent evidence.

3       Drs. VanderPlate and Ikawa's opinions, along with other evidence of record, constitute

4   substantial evidence that a reasonable mind could find adequately supports the proposition that

5   Plaintiff had mild limitations of social functioning and moderate difficulties maintaining

6   concentration, persistence, and pace.  *Thomas*, 278 F.3d at 957 ("The opinions of non-treating or

7   non-examining physicians may also serve as substantial evidence when the opinions are consistent

8   with independent clinical findings or other evidence of record.").   Courts are not tasked with

9   determining whether they would weigh the evidence similarly or reach the same conclusions as the

10  ALJ;[12] rather, courts are limited to determining whether the rationale offered by the ALJ is free from

11  legal error and is supported by evidence that a reasonable mind could accept as adequate support for

12  the conclusions reached.

13      However, as this matter is being remanded for the ALJ to conduct a new hearing and make

14  additional findings, Plaintiff is free to submit additional medical evidence from Dr. Nile or another

15  doctor regarding the longitudinal GAF scores as well as Plaintiff's social functioning and daily

16  activities.  Any other relevant medical evidence may also be submitted.

17  **C.     Plaintiff's Credibility**

18      The ALJ found that Plaintiff's statements regarding the extent of his limitations were not

19  fully credible.  (AR 31.)  The ALJ reasoned that Plaintiff's statements regarding his PTSD symptoms

20  were inconsistent, and he failed to participate in treatment for his PTSD when it was first offered to

21  him in May 2007.  (AR 30-31.)  The ALJ also noted that there was no objective medical basis for

22  the exertional limitations claimed by Plaintiff.  (AR 30.)

23      Plaintiff argues that the ALJ's reasons for finding Plaintiff not fully credible were not clear

24  and convincing.  (Doc. 15, at 9-10.)  The Commissioner contends that the ALJ gave legally sufficient

25  reasons to discredit Plaintiff's testimony, such as the lack of objective medical evidence to support

26

27

28      [12] *See Wagner v. Barnhart*, 208 Fed. App'x 536, 2006 WL 3421787, at *1 (9th Cir. 2006) (unpublished
    memorandum decision) ("Although we might have come to a different conclusion were we weighing the evidence in the
    first instance, substantial evidence supports the [ALJ's] decision.").

1  Plaintiff's alleged limitations, Plaintiff's inconsistent statements, and his daily activities. (Doc. 17,
2  at 19-22).

3      In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must
4  engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ
5  must determine whether the claimant has presented objective medical evidence of an underlying
6  impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.*
7  The claimant is not required to show that her impairment "could reasonably be expected to cause the
8  severity of the symptom she has alleged; she need only show that it could reasonably have caused
9  some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets
10  the first test and there is no evidence of malingering, the ALJ can only reject the claimant's
11  testimony about the severity of the symptoms if the ALJ gives "specific, clear and convincing
12  reasons" for the rejection. *Id.*

13      **1.     Testimony Regarding Exertional Limitations**

14      Plaintiff asserts that the ALJ failed to perform the first portion of the analysis to determine
15  whether Plaintiff had presented evidence of an impairment that could reasonably be expected to
16  produce pain or the symptoms alleged. (Doc. 15, at 9:12-25.)  In regard to any alleged exertional
17  limitations, the ALJ found that there was "no objective basis" for such limitations.  The ALJ
18  considered that Plaintiff did not allege any physical impairments or exertional limitations in his
19  initial disability reports or the disability reports he filed on appeal.  The ALJ also considered that
20  Plaintiff testified at the hearing that he had difficulty lifting over 10 to 15 pounds because of wrist
21  surgeries and a left elbow injury, but the medical evidence contained no evidence of recent wrist
22  complaints.  (AR 28.)

23      Further, the ALJ reasoned that the x-rays of Plaintiff's left forearm in January 2002 after a
24  fall onto his left elbow were unremarkable.  Finally, although x-rays of Plaintiff's cervical spine and
25  shoulders in March 2004 showed some disc space narrowing at C5-6 and C6-7 and some moderate
26  degenerative joint disease of the right acromioclavicular joint, Plaintiff did not complain of problems
27  or symptoms related to his neck or his right upper extremity; instead, Plaintiff's complaints were
28  limited to his wrists and left elbow.  The ALJ concluded that Plaintiff did not meet the first prong

of the credibility analysis with respect to exertional limitations.   20 C.F.R. §§ 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptom alleged"), 416.929(a). The ALJ did not err in finding that there was no evidence indicating that Plaintiff had a medical impairment that could be expected to produce the symptoms alleged.

### 2.    Testimony Regarding Mental Limitations

With regard to Plaintiff's mental limitations, the ALJ did not make explicit findings whether Plaintiff had presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.   However, because the ALJ analyzed Plaintiff's credibility for purposes of the second prong, the Court infers that the first prong of analysis was resolved in Plaintiff's favor. *See Godar v. Astrue*, No. C09-00736 HRL, 2011 WL 1103912, at *4 (N.D. Cal. Mar. 25, 2011) (ALJ did not expressly state that the plaintiff presented evidence of impairments that could reasonably be expected to produce symptoms alleged, but the "ALJ apparently found that the first prong was satisfied because he proceeded with, and focused his discussion on, the second prong of the analysis.  This court finds no error here."). Thus, as Plaintiff correctly asserts, the reasons set forth for discrediting Plaintiff's statements relating to his mental limitations must be specific, clear and convincing. *Vasquez* 572 F.3d at 591.

The ALJ found Plaintiff's testimony about the extent of his limitations "unconvincing" because Plaintiff's statements regarding his mental problems were often inconsistent. (AR 30-31.) Inconsistent statements concerning a claimant's symptoms is a proper factor for the ALJ to consider in his credibility determination. *Tommasetti*, 533 F.3d at 1039; *Bray*, 554 F.3d at 1226-27. The ALJ noted Plaintiff's statements and actions regarding his PTSD were often inconsistent, particularly with regard to the stressors that precipitated it.  For example, Plaintiff has given accounts of "enemy images" intruding on his thoughts, even though the predicate PTSD stressors he related to his doctors involved fellow soldiers, and Plaintiff never participated in combat.  (AR 30-31, 670.)  Further, Plaintiff previously reported having daily intrusive traumatic memories and flashbacks up to 15-20 times a week, but did not mention them in his hearing testimony. (AR 31, 1123-44). While Plaintiff

asserts that his symptoms stem from his military experiences, during his December 2005 psychiatric

admission he was found watching the movie "Platoon" in a VA hospital and had to be reminded

"that war movies might be difficult for other VA patients to see or hear." (AR 30, 744.).  The ALJ

inferred that claims of intrusive thoughts of enemy images as a result of PTSD were diminished in

light of Plaintiff voluntarily viewing a war movie.   These inconsistencies amount to "specific, clear

and convincing" reasons to reject Plaintiff's testimony and are supported by substantial evidence.

The ALJ also discredited Plaintiff's testimony because he failed to appear for treatment when

it was first offered in May 2007.  (AR 31.)  A claimant's unexplained or inadequately explained

failure to seek treatment is a proper factor for the ALJ to consider in his credibility determination.

*Tommasetti*, 533 F.3d at 1039.   The ALJ noted Plaintiff's failure to attend two scheduled

appointments and return phone calls in May 2007, when attempts were made to assist him with

PTSD symptoms. (AR 31, 1058.) VA treatment notes indicate that Plaintiff presented at the Fresno

VAMC, but would not wait for the psychiatric nurse case manager to see him. (AR 1058.) Plaintiff

apparently left his phone number, but the VAMC staff was unsuccessful in reaching him.  (AR

1058.)  The treatment note on May 3, 2007, states that "several attempts to schedule this veteran for

assistance with his PTSD symptoms [were made,] but he missed two [appointments] and did not

return [a staff member's] call."  The psychiatric nurse case manager noted that she would "await his

contact when he is ready to pursue therapy."  (AR 1058.)  On May 8, 2007, a treatment note

indicated that Plaintiff had returned and completed an assessment for the PTSD treatment program,

and his results would be considered and a plan of care would be outlined.  (AR 1057.)

Even though the record indicates that Plaintiff missed some isolated appointments at VA for

PTSD treatment, substantial evidence does not support an inference that Plaintiff failed to seek

treatment.  Rather, within a week of the May 3, 2007, treatment note indicating that Plaintiff had

missed several appointments, he returned to the VAMC to complete a PTSD assessment and did, in

fact, seek and receive extensive treatment with VA for PTSD.  This does not rise to the level of

"specific, clear and convincing" reason to reject Plaintiff's testimony.  However, this error is

harmless because the ALJ provided another clear and convincing reason – i.e., that Plaintiff's

testimony was inconsistent – for finding Plaintiff less than fully credible with regard to the extent

of his mental limitations. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (error may be deemed harmless where there remains the support of substantial evidence through other valid reasons to support the ALJ's conclusion).

As noted previously, however, as the case will be remanded, Plaintiff is free to submit additional statements to the ALJ and attempt to clarify any inconsistencies that exist.

**D.    Third-Party Lay Statements**

The ALJ gave little weight to third-party statements because they conflicted with Plaintiff's prior testimony, one of the statements was unsigned, and the statements were not made under oath or subject to cross-examination.  (AR 31.)  Plaintiff argues that the ALJ's rejection of these statements was technical and based upon evidentiary reasons that do not apply to administrative hearings.  (Doc. 15, at 10.)  Plaintiff also asserts that the fact that the lay statements indicated limitations more severe than those to which Plaintiff testified should not detract from the credibility of those statements.  Rather, the inconsistency is an indication that the third parties were not merely parroting Plaintiff's assessment of his own limitations but were independent and honest observations of Plaintiff's symptomatology.  The Commissioner contends that the ALJ correctly applied Social Security Ruling  ("SSR") 06-3p in rejecting the statements and provided legally sufficient reasons germane to each statement.[13]  (Doc. 17, at 22-23.)

Lay witness testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010).  Lay witness testimony cannot be disregarded without comment. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006).  In rejecting lay witness testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does

---

[13] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

"not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. *Lewis*, 236 F.3d at 512.

The ALJ found that the third party lay witness statements from Mr. Kovar and Mr. Alpoonarian "largely conflict[ed]" with Plaintiff's prior statements regarding his functioning. (AR 31.) The ALJ may reject statements made by other sources when they conflict with a claimant's functional abilities. *See Carmickle.*, 533 F.3d at 1163-64; *see also* SSR 06-3p, 2006 WL 2329939, at *4 (the ALJ may consider "how consistent the opinion is with other evidence"). Plaintiff reported on November 15, 2005, in an adult function report that he spent time with friends and family on a regular basis and, although he listed having a "short fuse for social activities," he did not report problems getting along with family, friends, or neighbors. (AR 112-13.) Additionally, Plaintiff reported that he finishes conversations that he starts, can pay attention for 30 minutes to one hour, and did not report problems with his memory, completing tasks, concentration, or understanding. (AR 113.) Further, he reported that he had no problems with personal care and did not need to be reminded to go places. (AR 109, 112.) In contrast, the ALJ observed that Mr. Alpoonarian found Plaintiff to be

> very seriously impaired in his ability to think, communicate, remember, interact socially, groom himself appropriately, and keep appointments. He also states that sometimes the claimant's conversation does not make sense, other times he is totally unresponsive to his surroundings, frequently he overreacts to common stresses by threatening to hurt himself or others, and occasionally becomes violent over the way people drive or how they look at him (Exhibit 12E).

(AR 31, 140-41.)

The ALJ's finding that Mr. Alpoonarian's statement was inconsistent with Plaintiff's own description of his limitations was a germane reason to reject it. The Court is not tasked with considering the persuasiveness of the ALJ's reasons for rejecting third-party statements, *see Meza v. Astrue*, No. EDCV 10-1347-OP, 2011 WL 1519249, at *7 (C.D. Cal. Apr. 18, 2011); rather, the Court reviews whether the ALJ provided reasons for rejecting the third-party statements that were germane to that witness. Here, the ALJ properly considered and rejected Mr. Alpoonarian's statement.

*///*

1    The ALJ also noted that Mr. Kovar, another third-party lay witness,

2    has known the claimant for approximately 15 years and has seen him change from
     a very quiet and mild-tempered person to someone who is on edge and short-
3    tempered, apparently due to some "really bad experience" while he was in the
     military.  Mr. Kovar does not believe the claimant could ever hold down a
4    meaningful job in this "mindset" (Exhibit 11E).

5    (AR 31, 139.)  The ALJ found that Mr. Kovar's statement was inconsistent with Plaintiff's own

6    statements about his limitations. This is a germane reason specific to this witness.  Additionally, the

7    ALJ noted that Mr. Kovar's statement was not signed.  (AR 31.)  The ALJ may consider "any other

8    factors that tend to support or refute the opinion" of lay witnesses.  SSR 06-03p, 2006 WL 2329939,

9    at *5.  The ALJ properly discredited Mr. Kovar's statement with germane reasons specific to Mr.

10   Kovar's statement.

11           Plaintiff also asserts that the ALJ improperly rejected these statements because they were not

12   made under oath or subject to cross-examination.  (Doc. 15, at 10:4-11.)  The Ninth Circuit has

13   repeatedly held that "[d]escriptions by friends and family members in a position to observe a

14   claimant's symptoms and daily activities have routinely been treated as competent evidence."

15   *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  This applies equally to the sworn hearing

16   testimony of lay witnesses, *see Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), as well as

17   to unsworn statements and letters of friends and relatives, *cf. Schneider v. Comm'r of Soc. Sec.*

18   *Admin.*, 223 F.3d 968, 974-75 (9th Cir. 2000) (letters submitted by friends or relatives must be

19   considered by ALJ and are relevant to a determination at the Third Step of the sequential evaluation).

20   Rejecting testimony because it is unsworn is not an appropriate ground to discredit it.  However,

21   because the ALJ offered other germane reasons to reject these lay statements, any error in this regard

22   was harmless.  *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ

23   will not be reversed for errors that are harmless." (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th

24   Cir.1990))); *see also Stout*, 454 F.3d at 1054.

25   **E.    Plaintiff's Exertional Limitations**

26           Plaintiff asserts that the ALJ erroneously concluded that Plaintiff had no exertional

27   limitations in determining Plaintiff's RFC. At the Second Step, the ALJ found that Plaintiff had no

28   severe physical impairments.  While Plaintiff asserted that he had difficulty lifting over 10 to 15

pounds because of wrist surgery and a left-elbow injury, the ALJ determined there was no recent medical evidence that reflected complaints for a wrist injury. Further, x-rays from January 2002 following a fall onto Plaintiff's left elbow were unremarkable. While there were x-rays of Plaintiff's cervical spine and shoulders in March 2004 that indicated some disc space narrowing at C5-6 and C6-7 as well as some moderate joint disease of the right acromioclavicular joint, the ALJ noted that Plaintiff did not state that he had any problems with his neck or right upper extremity. Thus, the ALJ concluded that there was no evidence to support that a physical impairment significantly affected his ability to perform basic work activities.

Plaintiff does not contend the ALJ was incorrect in finding that Plaintiff had no severe physical impairment. Rather, Plaintiff asserts that the ALJ was nonetheless required to consider all Plaintiff's limitations at later steps of the sequential evaluation, including those that resulted from his physical limitations whether or not the limitations were due to a severe condition. However, other than Plaintiff's statements that he could not lift over 10 to 15 pounds, there is no evidence in the record to indicate that Plaintiff suffered from any physical limitations. Plaintiff's testimony about his physical limitations was found not credible because there was no medical evidence of a condition that could reasonably produce the symptoms of which Plaintiff complained. Thus, there was no evidence of any physical limitation that the ALJ failed to address at the later steps of the evaluation. Thus, the ALJ did not err in finding that Plaintiff had no exertional limitations.

**F.    Limitations Due to Loss of Hearing**

Plaintiff asserts that the ALJ erred in finding that Plaintiff has the ability to adhere to safety rules at a job because Plaintiff has a hearing problem. (Doc. 15, at 11:22-12:3.) Plaintiff does appear to have a hearing limitation, but the ALJ specifically noted Plaintiff's use of hearing aids. (AR 28.) Plaintiff fails to establish how his hearing and speech – which has improved with the use of hearing aids – has any effect on his safety or his ability to adhere to safety rules. However, as this case is remanded for further VE testimony, Plaintiff is free to pose a hypothetical to the VE regarding whether a person with Plaintiff's hearing limitation could adhere to any safety rules imposed by any jobs that the VE may identify.

**G.    Plaintiff's Work History**

Plaintiff alleges the ALJ erred by failing to make a disability determination similar to that in *Gatliff v. Comm'r of Soc. Sec.*, 172 F.3d 690 (9th Cir. 1999).  Plaintiff reasons that the record indicates a pattern of short-term employment that establishes his inability to sustain or keep a job due to his mental limitations, specifically the inability to work with supervisors.  Plaintiff contends that the ALJ erred by failing to consider Plaintiff's work history as an indication of his mental limitations.

The Commissioner asserts that *Gatliff* is "readily distinguishable" on several grounds.  For example, in *Gatliff*, the Commissioner conceded that the claimant was unable to hold a job for more than a few months, which the Commissioner has not conceded in this case.  Moreover, the record indicates that Plaintiff has been able to maintain past work for periods of years – not merely two months or less.  In jobs where Plaintiff's employment was terminated after only months, the reasons for the terminations do not reflect that they were uniformly based upon Plaintiff's mental limitations.

In *Gatliff*, the claimant, Loyd E. Gatliff, had severe mental impairments.  *Gatliff*, 172 F.3d at 691.  During the 15 years prior to his filing his disability application, the record indicated that he was sporadically employed and held 20 to 30 jobs.  *Id.* at 691.  He was terminated from half of those jobs, the longest of which lasted six to eight months, due to anger problems and conflicts with supervisors or co-workers.  *Id.*  In response to questions posed by Gatliff's counsel, the VE testified that Gatliff could only be expected to stay in any one job for a "couple of months" before being fired as a result of his mental impairments.  *Id.* at 691.  The VE also testified that Gatliff's pattern – the ability to obtain, but not maintain jobs – would continue.  *Id.*  On appeal, the Commissioner conceded that Gatliff had a work history showing that he performs jobs for a duration of about two months and did not dispute that the pattern would continue.  *Id.* at 692.  The Commissioner nevertheless argued that Gatliff was not precluded from performing substantially gainful work activity because he was able to move from one job to the next after termination.  *Id.*  This argument was rejected by the court.  *Id.*

Here, there is evidence that Plaintiff was employed with multiple employers between 1990 and 2005 and that at least two of the jobs he performed lasted less than a year.  Plaintiff testified at

his hearing that, between 1990 to 2005, he worked 10 temporary jobs and 40 additional jobs. (AR 1130-31.) Plaintiff's testimony, however, was found to be not fully credible, and the record reflects that there are several inconsistencies regarding Plaintiff's work history. For example, despite his testimony at the hearing, Plaintiff's disability application reflects that Plaintiff reported only one job on his work history – employment with Wood Smith Properties from 1990 to 1998. (AR 101.) Plaintiff reported to an examining physician in October 2003 that he had worked for Wood Smith Properties for 15 years. (AR 169.) Plaintiff also informed this examining physician that he worked at Motel 6 for two years from approximately 1999 to 2001, when he was "fired unjustly." (AR 168-69.) He further reported that he was unemployed for two years after he left his job at Motel 6. (AR 170, 172.)

On the contrary, a September 2005 VA treatment note indicates that Plaintiff reported that he worked for Motel 6 from May 2000 until June 2004, when he was "fired unexpectedly" and "for unclear reasons." (AR 201.) When Plaintiff was hospitalized between September 21 and 22, 2005, he reported that he was unemployed (AR 244), but that he had worked for LS Enterprises until approximately a month and a half prior to his hospitalization, and there were "outstanding issues involving money embezzlement" with LS Enterprises.[14]  (AR 201.)

In a separate form completed in October 2005, Plaintiff reported a history of several jobs. Plaintiff reported that he worked for "San Mar Properties" from October 2001 to April 2002. (AR 84.) He was fired by human resources because he "caused lots of man hours to audit the office," but Plaintiff reported that he essentially lost the job for "no reason." (AR 84.) Plaintiff also reported employment with The Reserves, LLC beginning in September 2005 and lasting until March 3, 2006.[15]  He stated he stopped working there because of "threats of employment lay-off, [in]secure position, and foul language abuse per phone and in person by Property Owner against [Plaintiff.]" (AR 84.) Plaintiff also reported working for Manco Abbot for an unspecified period of time and that

---

[14] It is possible that LS Enterprises and Scott Ellis are actually the same employer, but there is no evidence of this.

[15] The end date listed for work at The Reserves, LLC is "3.3.5," which appears to indicate March 3, 2006, given the start date listed as September 28, 2005.

1  he left that job because of "employer stress, depression, anxiety, moods, victim of job security and

2  [u]nstable position . . . [w]as assigned property, never received it."  (AR 85.)

3        At the October 2007 hearing, Plaintiff stated that he worked for Motel 6 between 2000 and

4  2001, and he was fired because he "got in a dispute with the area manager concerning my property,

5  and I was let go at will."  (1131.)  Plaintiff worked for Manco Abbott as a property manager for at

6  least eight months "in 2003 or 2004," but was fired because he questioned the employer. (AR 1130.)

7  Plaintiff then worked for The Reserves performing property management, which was a six-month

8  position that he left because sales and marketing were low and "they wanted to try a different person

9  in there." (1130.)  Plaintiff worked for Scott Ellis beginning in July 2005 for approximately four

10  months, but was fired after $100 was misplaced.  (AR 1129.)  In September 2005, Plaintiff worked

11  for JFM Management company for approximately three weeks when he was fired after Plaintiff

12  "questioned [his] position" and had an argument with his boss.  (AR 1128.)

13        This does not constitute substantial evidence that Plaintiff is unable to obtain *and retain*

14  substantial gainful employment pursuant to *Gatliff*.  The evidence of Plaintiff's job history is based

15  almost entirely on Plaintiff's statements, and Plaintiff has been found to be less than fully credible.

16  Moreover, the inconsistencies in Plaintiff's statements related to his work history indicate that the

17  information is not entirely reliable.  Even accepting the fact that Plaintiff lost several jobs in 2004

18  and 2005 after shorter-term employment, this does not support an inference that Plaintiff cannot

19  retain any employment for a significant time as was the case in *Gatliff*.  In *Gatliff*, the claimant had

20  a 15-year job history prior to his claimed disability that included 20-30 jobs, none of which lasted

21  longer than 8 months due to anger problems and conflicts with supervisors or co-workers.  *Gatliff*,

22  172 F.3d at 691.  Here, Plaintiff does not have a 15-year history that indicates an inability to retain

23  work for longer than several months.  In fact, many of Plaintiff's jobs in the years prior to his

24  claimed disability lasted several years.  Although Plaintiff testified that he had as many as 50 jobs

25  between 1990 and 2005, only a handful of jobs were recounted during his testimony and on forms

26  submitted to the Commissioner.

27        Additionally, it does not appear from the evidence that Plaintiff lost all of his jobs because

28  of his mental limitations.  Plaintiff reported a variety of reasons for leaving jobs in 2004 and 2005,

40

including the instability of the position and the fact that the employer had not followed through with promised work assignments.   Therefore, this evidence was not probative or significant as it was inconsistent, unreliable, and does not support an inability to retain *any* employment for a significant period of time.   The ALJ did not err in failing to consider Plaintiff's work history as evidence of his inability to retain substantially gainful work activity.   *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (ALJ does not need to discuss all the evidence presented; rather, he must explain why "significant probative evidence has been rejected").

Moreover, even if Plaintiff's work history was probative or significant such that the ALJ was required to discuss that evidence, it would not constitute substantial evidence that a reasonable mind could accept as adequate to support the proposition that Plaintiff lacks an ability to retain *any employment* for a significant period of time due.   If it were, failed work attempts would always be considered substantial evidence of a claimant's inability to retain work for any significant period of time, and would require benefits be awarded pursuant to *Gatliff*.   This is an overbroad application of *Gatliff*.

The ALJ agreed that Plaintiff was not able to perform his past relevant work in light of his mental limitations.   (AR 31.)   All the work from which Plaintiff was fired or quit in 2004 and 2005 was the type of past relevant work that the ALJ found Plaintiff could no longer perform.   Thus, Plaintiff's failure to retain this type of work for a significant period is not evidence that he could not retain *other* types of work.

## VI.   CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.   The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Jesse Gonzales and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   September 27, 2011**            **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE